IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STACY ALBERT CLARK**, an individual**,** **DYLAN L. PEPPERS**, an individual**,** and **RAE ANNE WILKS**, an individual,<br><br>        Plaintiffs,<br><br>      v.<br><br>**JAMES FARR**, in his individual capacity; **ROSANNA POST**, as Personal Representative for the Estate of Decedent Jason James Post; **ADAM GREGORY**, in his individual capacity; **SCOTT HAYS**, in his individual capacity; **UMATILLA COUNTY SHERIFF'S OFFICE**, a government agency; **UMATILLA COUNTY**, a government agency; and **CITY OF MILTON-FREEWATER**, a municipal corporation,<br><br>        Defendants. | Case No. 2:22-cv-294-SI<br><br>**OPINION AND ORDER** |

J. Michael Mattingly, MATTINGLY LAW FIRM, LLC, 12725 SW Millikan Way, Suite 300, Beaverton, OR 97005. Of Attorneys for Plaintiffs.

Robert E. Franz, Jr., FRANZ & HENDERSON, P.O. Box 62, Springfield, OR 97477. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      Plaintiffs Stacy Albert Clark, Dylan L. Peppers, and Rae Ann Wilks (collectively, "Plaintiffs") sue Defendants James Farr, a Milton-Freewater police officer; Rosanna Post (as personal representative for Jason Post ("Post"), a Umatilla County Sheriff's Deputy); Adam Gregory, a Umatilla County Sheriff's Sergeant; Scott Hays, a Milton-Freewater police officer;

PAGE 1 – OPINION AND ORDER

the Umatilla County Sheriff's Office; Umatilla County ("County"); and the City of Milton-Freewater ("City,") (collectively, "Defendants"). Clark brings claims against Farr and Rosanna Post under 42 U.S.C. § 1983 for alleged violations of his Fourth Amendment and Fourteenth Amendment rights; and against the County Sheriff's Office, the County, and the City (collectively, the "Government Defendants") for negligence. Peppers brings claims against Farr, Rosanna Post, and Hays under § 1983 for alleged violations of his Fourth Amendment and Fourteenth Amendment rights; and Wilks brings claims against Gregory under § 1983 for alleged violations of her Fourth Amendment and Fourteenth Amendment rights. In addition, all Plaintiffs bring claims against the Government Defendants under § 1983 for an alleged unconstitutional custom, policy, or procedure; and under state law for false arrest, battery, and trespass. Plaintiff Clark moves for partial summary judgment on his claims against Rosanna Post and Farr under § 1983 and against the Government Defendants for trespass.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of

PAGE 2 – OPINION AND ORDER

proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

On February 24, 2020, shortly before midnight, Clark used his semi-automatic firearm to shoot a few dozen rounds into the air in an empty field near his home. Clark's neighbors Jonathan Carrillo and his wife Yesenia Carmona, Billy Robing, and Michaela Berry called 911 to report that they heard gunshots. *See* ECF 48-3 ("Robing 1st Call"); ECF 48-6 ("Carrillo Call"); ECF 48-8 ("Berry Call"). Robing and Berry did not identify the person firing the gun, but Carrillo identified the shooter as his neighbor in the yellow house. *See id.* Law enforcement officers Post and Farr were dispatched to the scene and arrived at Carrillo's home shortly after midnight on February 25th. ECF 43-9, at 2-3; ECF 43-1 at 75:13-23 ("Farr Depo. Tr."). After

PAGE 3 – OPINION AND ORDER

speaking with Carrillo, the officers drove to Clark's home. The officers did not turn on their car overhead lights or sirens. Farr Depo. Tr. 93:12-15.

Upon arriving at Clark's home, the officers used their flashlights to look around the parking area and the front yard of the property. *Id.* at 119:23-121:8. The officers intended to make contact with the person in the home to learn more details about the gunfire earlier that night. *Id.* at 115:10-116:6. There was no audible noise coming from inside the house. *Id.* at 108:23-109:24. Both officers were armed with semi-automatic rifles. *Id.* at 153:3-15, 158:1-3.

Post knocked on one of the doors to Clark's house, and when no one answered after a short period, Post walked around the rest of the front yard and side yard. *Id.* at 142:11-143:6. Post then came back to the door and knocked again, and before Clark answered the door, announced himself as police. *Id.* at 143:7-11, 146:23-147:14. Clark answered the door. Farr was between two cars in the parking area, and Post "eclipsed" Farr's view of the front door. *Id.* at 147:21-148:21. The parties dispute whether Clark answered the door holding a handgun, whether Clark pointed the handgun at the officers, and whether Post told Clark to drop the gun. Shortly after Clark opened the door, Post fired three gunshots, *id.* at 153:16-21, and Farr fired a shot a few seconds later, *id.* at 158:1-11. Two of the bullets struck Clark in the torso, ECF 43-20 at 3, and a third grazed Clark's ear, ECF 43-19 at 3.

Shortly after the shooting, Robing called 911 again, this time reporting: "I think an officer may have been shot at or shot." ECF 48-9. About ten minutes after the shooting, Trooper Darin Wong arrived on the scene and spoke to the officers and Clark. *See* ECF 48-13 (car camera footage of Wong speaking to Clark); ECF 58-1 at 8. Post and Farr were also interviewed by detectives from the Pendleton Police Department and the Oregon State Police more than six days after the shooting. ECF 43-6 at 129:21-130:2 ("Bowen Depo. Tr."). The interviews were not

PAGE 4 – OPINION AND ORDER

given under oath, subject to cross-examination, or video- or audio-recorded. *Id.* at 125:17-126:20.

Clark now moves for partial summary judgment on his claims of an unconstitutional search, an unconstitutional use of deadly force, and state law trespass. Defendants oppose Clark's motion.

## DISCUSSION

### A. Evidentiary Considerations

The parties dispute whether several pieces of evidence are admissible. In evaluating the nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Sandoval v. County of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) (Kozinski, J., dissenting) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to

PAGE 5 – OPINION AND ORDER

"object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); 56(c)(4) (establishing that a declaration in support of summary judgment must present "facts that would be admissible in evidence").

### 1. Post's Interview

Post passed away unexpectedly in an unrelated incident before this lawsuit was commenced. Before Plaintiffs filed their complaint, Post sat for an interview before a certified court reporter on March 2, 2020. The parties dispute whether this interview is admissible if offered by Defendants. Clark contends that it is inadmissible hearsay because it was not sworn testimony and Post was not subject to cross-examination. Defendants argue that it is admissible under the residual hearsay exception. Fed. R. Evid. 807.[1] Post's statements in the interview cannot be presented at trial in another form that does not involve questions of hearsay.

The residual hearsay exception allows for the admission of hearsay statements if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

---

[1] Defendants also argue in their sur-response that the interview satisfies the public records and business records exceptions to the hearsay rule, pursuant to Rules 803(6) and 803(8) of the Federal Rules of Evidence. But Defendants did not raise this argument in their original response to the motion for summary judgment and therefore have waived it. *See Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("arguments raised for the first time in a reply brief are waived" (quotation marks omitted)). Even if this argument were properly raised, the report includes multiple layers of hearsay, and the Rule 803(6) and 803(8) exceptions do not make hearsay statements within the reports admissible. *See* Fed. R. Evid. 805 (multiple hearsay).

PAGE 6 – OPINION AND ORDER

Fed. R. Evid. 807. This exception is designed for "exceptional circumstances." *United States v. Bonds*, 608 F.3d 495, 500 (9th Cir. 2010). It also "involves discretion. It exists to provide judges a 'fair degree of latitude' and 'flexibility' to admit statements that would otherwise be hearsay." *Id.* at 501 (quoting *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994).

The Court finds that Post's interview is not one of those "exceptional circumstances" in which the residual exception is warranted. There are not sufficient guarantees of trustworthiness: Post was not under oath or cross-examined, the interview was not recorded by video or audio, and Post was provided the questions that he would be asked beforehand. Bowen Depo. Tr. at 128:1-17. Post also had an incentive to misrepresent what happened: if Clark had not raised a gun at him, Post would be subject to severe discipline and legal action. Although there is some evidence corroborating Post's statement in his interview that Clark pointed a gun at him—the testimony of Robing and Carrillo, as described below—this evidence is not sufficient to outweigh the other factors. Finally, Post's interview is not more probative than any other evidence, as Clark will also testify as to what occurred and that he did not hold a gun or point one at Post. Thus, the Court does not consider Post's interview as evidence in resolving this motion.

**2. Post's Statements at the Scene**

Clark also challenges the admissibility of the statements of witnesses Carrillo and Robing that Post told Clark to drop the gun the night of the incident. Clark does not argue that Post's underlying statements are inadmissible hearsay but contends that neither witness had sufficient personal knowledge because they did not see the event, but only heard voices. Defendants respond that Carrillo and Robing sufficiently witnessed the event to have personal knowledge, and that Post's statement of "drop the gun" is either not hearsay because it is a command, or

PAGE 7 – OPINION AND ORDER

verbal act, or is an exception to hearsay as an excited utterance, present sense impression, or statement that goes to his then-existing mental, emotional, or physical condition.

The Court find that Carrillo and Robing have sufficient personal knowledge to testify to Post's statement. "A witness who merely testifies to the fact that a declarant made the statement . . . need only have firsthand knowledge that the statement was made, not of the events described in the statement." *Bemis v. Edwards*, 45 F.3d 1369, 1373 n.2 (9th Cir. 1995) (citing Fed. R. Evid. 602 advisory committee's note; *United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985)). Although Robing did not visually see Post stating "drop the gun," and only "heard the voice command," ECF 49 at 3 ("Robing Decl."), he has personal knowledge of the sound or statement and can testify that he heard someone say: "drop the gun." Similarly, though Carrillo only heard a shout of "put the gun down," ECF 48-7, he also has personal knowledge.

Further, Post's statement of "put down the gun" is not hearsay because it is a verbal act that is not offered for the truth of what it asserts. It is a command, which under these circumstances is not an assertion of fact and is not hearsay. *See United States v. Garza*, 2024 WL 4216952, at *19 (E.D. Cal. Sept. 17, 2024) (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 662-63 (7th Cir. 2017) for the proposition that "[a] command is not hearsay because it is not an assertion of fact"); *see also State v. Aragon*, 512 P.2d 974, 976 (N.M. App. 1973) (concluding that a third-party witness's testimony that a victim stated "[p]ut that gun down" was a verbal act and thus not hearsay). The Court thus considers the declarations of Carrillo and Robing as to what they heard immediately before the shooting in resolving this motion.

### 3. Post's Statements to Wong

Finally, Clark argues that Post's statements to Wong approximately 10 to 15 minutes after the shooting are inadmissible hearsay because Post had time to reflect on what he would say, and he was not still under the stress of the event. Defendants respond that Post's statement

PAGE 8 – OPINION AND ORDER

to Wong is close enough in time to serve as a present-sense impression, goes to Post's then-existing mental state, or is admissible under the residual hearsay exception.

For the exception for present-sense impression, Rule 803(1) of the Federal Rules of Evidence allows statements that would otherwise be hearsay if they are "describing or explaining an event or condition, made while or immediately after the declarant perceived it." As noted in the Advisory Committee Notes to Rule 803(1) of the Federal Rules of Evidence, the "underlying theory of [the exception] is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Fed. R. Evid. 803(1) advisory committee's note to 1972 amendment. The present-sense impression exception "recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." *Id.*

Defendants cite two out-of-circuit cases to argue that Post's statements to Wong, made 10 to 15 minutes after the shooting, qualify as present-sense impressions. *See United States v. Blakely*, 607 F.2d 779, 786 (7th Cir. 1979) (holding that the district court did not err in admitting statements made at a maximum of 23 minutes—and likely only several minutes—after an event); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 706 (S.D. Ga. 1993) (holding that a less-than 10-minute time gap qualified as a present-sense impression). But other circuit courts have found that statements made 10 to 15 minutes after an event do not constitute a present-sense impression. *See United States v. Penney*, 576 F.3d 297, 313-14 (6th Cir. 2009) (holding that a statement made 10 to 15 minutes after the declarant's confrontation with law enforcement was over, where declarant "had to have known . . . that . . . he had shot somebody, and most likely that that was a police officer," was not a present-sense impression (quotation marks omitted)); *United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979) ("[A] out-of-court statement made at

PAGE 9 – OPINION AND ORDER

least fifteen minutes after the event it describes is not admissible unless the declarant was still in a state of excitement resulting from the event.").

The Court finds *Penney* persuasive, given the similar facts. As the Sixth Circuit explained, the declarant "knew what was at stake at the time he made the statement[; thus,] the statement was unreliable" because the declarant "had time and motive to contrive or misrepresent." *Penney*, 576 F.3d at 313-14 (quotation marks omitted). Here, Post knew that he had shot a civilian and what was at stake. He had time to reflect on what to tell Wong, and there is a likelihood of misrepresentation. This statement, therefore, does not qualify as a present-sense impression.

For the exception for then-existing mental state, Rule 803(3) of the Federal Rules of Evidence allows statements that would otherwise be hearsay if they go to "the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition, but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Defendants argue that Post's statements to Wong support his motive and justification in shooting Clark. The Ninth Circuit, however, has explained that the state-of-mind exception

> does not permit . . . any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm scared because [someone] threatened me."

*United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994) (quotation marks omitted). Post's statement that Clark pointed a gun at him is a statement of belief, akin to "I'm scared because someone threatened me," and thus is not admissible as a statement of his then-existing mental state.

PAGE 10 – OPINION AND ORDER

As discussed, the residual hearsay exception applies only in exceptional circumstances. Post's statements to Wong do not qualify for this exception for the same reasons Post's interview does not qualify: there are not sufficient guarantees of trustworthiness, Post had an incentive to misrepresent what happened, and the statements are not more probative than other available evidence. Although there is some evidence corroborating Post's statements, this evidence does not outweigh the other factors. Therefore, the Court finds that statements made by Post to Wong are inadmissible hearsay in any form in which they are presented to the Court and does not consider them in resolving this motion.

## B.  Warrantless Search

Clark argues that Farr and Post conducted an unconstitutional warrantless search by entering the curtilage of Clark's home and knocking on his door at around midnight. Clark does not dispute that a police officer sometimes does not need a warrant to knock on a door and wait to speak with the person inside (a "knock and talk"), but argues that there are "spatial and temporal limits" on this exception. *See Florida v. Jardines*, 569 U.S. 1, 19-20 (2013) (Alito, J., dissenting). Because there was no emergency, exigency, or consent, Clark argues that the officers violated his Fourth Amendment rights by knocking on his door shortly after midnight.

Defendants respond that they are entitled to qualified immunity on this claim. Based on the Court's prior Order, ECF 56, construing Defendants' response only as a response and not a cross-motion for summary judgment, the Court construes this argument as contending that there is a disputed issue of fact. Defendants argue that Farr and Post were merely performing a "knock and talk" and did not need a warrant. They argue that the "spatial and temporal limits" referenced in *Jardines* is nothing more than dicta in a dissent, and that Clark should have been expecting a visit by law enforcement after he shot 60 rounds in the middle of the night.

Under Ninth Circuit law, the "knock and talk" exception permits law enforcement officers to enter the curtilage of a home to ask questions of the occupants. *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016). "[T]o qualify for the exception, the government must demonstrate that the officers conformed to the habits of the country by doing no more than any private citizen might do." *Id.* at 1159 (cleaned up). "In some circumstances, an early morning visit may be 'consistent with an attempt to initiate consensual contact with the occupants of the home.'" *Id.* (quoting *United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012)). For example, "the officers may have a reason for knocking that a resident would ordinarily regard as important enough to warrant an early morning disturbance." *Id.*

It is undisputed that Clark fired about 60 rounds into the air, and that three neighbors called 911 to express concern and fear because of the shots. The investigation of this shooting is a "reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance." *Id.* Viewing the facts in the light most favorable to the nonmoving party, there is a genuine dispute of material fact as to whether a reasonable person could expect to shoot dozens of rounds in the middle of the night without receiving a visit from concerned neighbors, or, more likely, the police. Thus, even accepting the limits on the "knock and talk" exception, at this stage of the litigation, it is for the jury to evaluate whether the officers violated Clark's Fourth Amendment rights by knocking on his door. The Court thus denies Clark's motion for summary judgment as to this claim.

## C. Use of Deadly Force

Clark argues that Post unconstitutionally used deadly force against Clark, in violation of his Fourth Amendment rights. Clark contends that Post's use of force was not "objectively reasonable," as required under *Graham v. Connor*, 490 U.S. 386, 397 (1989), because there is no admissible evidence establishing that Clark held or raised a firearm when he was shot.

PAGE 12 – OPINION AND ORDER

Defendants respond that there is admissible evidence that Clark was holding a gun, and even pointing it at the officers, such that there is a genuine dispute as to whether the use of force was objectively reasonable.

Under *Graham*, to determine whether an officer has violated the Fourth Amendment, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (quotation marks omitted). Thus, the Court first "assess[es] the gravity of the particular intrusion on Fourth Amendment interests," then "assess[es] the importance of the government interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted).

At the first step, Defendants do not dispute that Post used deadly force in shooting Clark. "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Thus, Post's conduct resulted in a serious intrusion on Clark's Fourth Amendment interests, and the Court must determine if the governmental interests were sufficient to justify this use.

At the second step of the *Graham* analysis, the Court evaluates the government's interest by assessing the "core factors": (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was "actively

PAGE 13 – OPINION AND ORDER

resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors are not exclusive, and the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The Ninth Circuit has stated, however, that "the most important single element of the three specified factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *see also Young*, 655 F.3d at 1163 ("Of the three factors we traditionally examine in determining the governmental interest, the most important is whether the individual posed an immediate threat to officer or public safety.").

For the first factor, Clark's initial "crime" was at most the misdemeanor of disorderly conduct. *See* Or. Rev. Stat. § 166.025. "While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." *Bryan*, 630 F.3d at 828-29 (quotation marks omitted). When the officers arrived, Clark had returned to his house and was no longer shooting his firearm or engaged in any crime. This factor weighs in favor of finding that Post used unreasonable force.

For the third factor, there is no evidence that Clark attempted to flee when Post shot him. Both parties present evidence that Post shot Clark just a few seconds after he opened the door, and that Clark did not attempt to run away in those few seconds. This factor also counsels in favor of finding that the force was unreasonable.

For the second, and most important factor, however, viewing the facts in the light most favorable to the nonmoving party, there is a genuine disputed issue of material fact as to whether Clark posed an immediate threat to the safety of the officers or others. Clark does not dispute that, if there were admissible evidence that Clark had raised a firearm at Post, there would be a

PAGE 14 – OPINION AND ORDER

factual question as to whether the governmental interests justified Post's use of deadly force. If Clark raised his gun at Post, he would have posed an immediate threat to the safety of the officer.

Defendants offer declarations of two witnesses to argue that Post's use of force was reasonable. *See* Robing Decl.; ECF 50 (Carrillo declaring that he will testify as to information in ECF 48-7). Both witnesses state that they heard an officer announce themselves at Clark's house and the voice command of "drop the gun" (Robing) or "put the gun down" (Carrillo). Defendants also offer Clark's own statement to Wong shortly after the incident, where Wong asked Clark if he came to the door with a pistol in his hand, and Clark replied: "You're . . . right I come with a pistol, this is America man, I have the right to defend myself." ECF 48-13 at 29:58. Clark also told Wong, however, that he was not holding a gun when he was shot, *see id.*, and Clark stated in his responses to Defendants' interrogatories that he was not holding a gun when he answered the door, ECF 48-12 at 5. Viewing the facts in the light most favorable to the nonmoving party, a reasonable juror could find that Clark had pointed a gun at Post, and that Clark therefore posed an immediate threat to Post's safety. A reasonable juror thus could find that Post was justified in his use of deadly force against Clark, and summary judgment is not appropriate on this claim.

**D.  Trespass**

Finally, Clark argues that the Government Defendants, acting by and through Farr and Post, trespassed on Clark's property. Clark asserts that Farr and Post not only knocked on Clark's front door without a warrant, but also walked around the sides of his home. In response, Defendants argue that going to and knocking on a front door does not constitute trespass, and that a police officer may arrest a person for a crime at any time. *See* Or. Rev. Stat. § 133.235.

Under Oregon law, "approaching a person's front door and knocking is not a trespass, unless the resident has evidenced a desire to exclude casual visitors." *State v. Hitesman*, 113 Or. App. 356, 359 (1992). But "[g]oing to the back of the house is a different matter. Such an action

PAGE 15 – OPINION AND ORDER

is both less common and less acceptable in our society. There is no implied consent for a stranger to do so." *State v. Ohling*, 70 Or. App. 249, 253 (1984). Instead, "[a]n officer may acquire the authority or privilege to enter another's property from a warrant or if an exception to the warrant requirement applies." *Box v. Dep't of Or. State Police*, 311 Or. App. 348, 379 (2021). These exceptions include "exigent circumstances, the need for emergency aid, or express or implied consent." *Id.* "An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or. 119, 126 (1991).

The Oregon Court of Appeals has held a report of a person with a gun can constitute an emergency justifying an officer's trespass. In *State v. Martofel*, 151 Or. App. 249, 251 (1997), police officers were dispatched in accordance with a 911 phone call about a "man with a gun" in a Portland neighborhood, and an officer entered the defendant's backyard without a warrant. Although the "man with the gun" was a neighbor waiting for a ride to go hunting, who had left the area before police arrived, the officer did not know that when he entered the defendant's backyard. *Id.* "Instead, at the time of the entry into defendant's backyard, the officer knew only that an armed man had been seen in a Portland neighborhood. The circumstances known to the officer presented a situation requiring swift police action—a 'true emergency.'" *Id.* at 254. These facts are analogous to the undisputed facts here: Clark fired about 60 rounds, and police were dispatched in accordance with multiple 911 calls about hearing gunshots. Although Clark had stopped shooting when the police arrived, and Carrillo reported that Clark was shooting into the air, ECF 43-12 at 9, Defendants provide evidence that the officers believed that a dangerous, armed person was still at large. In his 911 call, Carrillo identified Clark as the person shooting, *id.* at 8-10, and when Post and Farr arrived at Carrillo's house, Carrillo pointed them in the

PAGE 16 – OPINION AND ORDER

direction of Clark's house, ECF 43-1 at 18-19. Viewing the facts in the light most favorable to Defendants, there are disputed facts requiring resolution by a jury about whether an emergency that would justify a trespass existed. Thus, the Court denies summary judgment on Clark's state law claim for trespass against the Government Defendants.

## CONCLUSION

The Court DENIES Clark's motion for partial summary judgment. ECF 42.

**IT IS SO ORDERED**.

DATED this 1st day of November, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge